IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 11, 2007

**STATE OF TENNESSEE EX REL. SUZY WHITLEY**
**v.**
**SAM LEWIS**

**An Appeal from the Juvenile Court for Fayette County**
**No. 2382     J. Mike Whitaker, Judge**

_____

**No. W2006-02333-COA-R3-JV - Filed July 24, 2007**

_____

This appeal involves a claim in juvenile court to recover child support payments. The mother of the child at issue told the respondent that he was the child's father. In reliance on this, the respondent signed a voluntary acknowledgment of paternity, and the juvenile court entered an agreed order setting child support and establishing the respondent's child support arrearage. Over two years later, the respondent learned that the child might not be his, and he petitioned the juvenile court for a paternity test. His petition was granted, and the test showed that he was not the biological father of the child. The juvenile court set aside the voluntary acknowledgment of paternity based on fraud, relieved the respondent of any future obligation to pay child support, and forgave all past child support arrearages. Subsequently, the respondent filed a petition against the mother, seeking damages because the mother had fraudulently induced him into signing the voluntary acknowledgment of paternity. The juvenile court granted the respondent's petition against the mother, awarding him damages consisting of the child support erroneously paid, the cost of paternity testing, and attorney's fees. The State, on behalf of the mother, now appeals. We reverse, concluding that the juvenile court erroneously forgave the respondent's accrued child support arrearages, and that the juvenile court did not have jurisdiction to adjudicate the respondent's petition against the mother for damages.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court is**
**Reversed and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

Robert E. Cooper, Jr., Attorney General & Reporter, and Lauren S. Lamberth, Assistant Attorney General, for the appellant, State of Tennessee ex rel. Suzy Whitley.

David L. Douglas, Somerville, Tennessee, for the appellee, Sam Lewis.

# OPINION

In November 1999, Petitioner/Appellant Suzy Whitley ("Mother") and Respondent/Appellee Sam Lewis ("Lewis") were involved in an intimate relationship. At the time, Mother was living with a man named Yates ("Yates"), and Lewis was engaged to another woman. On July 11, 2000, Mother gave birth to a son, M.C.L. ("the child" or "M.C.L."), the child at issue in this action. At the time the child was born, Mother told Yates that he was the father of the child, and Yates denied it, telling Mother that he could not father a child.

In approximately 2002, when M.C.L. was two years old, Mother told Lewis that he was the father of M.C.L. Based on Mother's statement, Lewis believed that he was the child's biological father. Consequently, on September 10, 2002, Lewis signed a voluntary acknowledgment of paternity ("VAP"), acknowledging that he was M.C.L.'s biological father. Thereafter, M.C.L. was given Lewis's last name. Lewis established a father-child relationship with M.C.L., visiting the child on weekends and having the child call him "Daddy."

On December 29, 2003, the State of Tennessee ("State"), on behalf of Mother, filed a petition against Lewis to set Lewis's child support obligation in the Juvenile Court below.[1] On January 16, 2004, the Juvenile Court entered an agreed order requiring Lewis to pay $317 per month in child support. The order also stated that Lewis was in arrears by $13,314, and ordered him to pay this arrearage at a rate of $50 per month.

Some time later, one of Mother's friends called Lewis and told him that he was not M.C.L.'s father. Lewis confronted Mother and she apparently admitted to Lewis that he was not M.C.L.'s father. On April 7, 2005, Lewis filed a petition in the Juvenile Court seeking a paternity test. Lewis's petition stated that he had signed the VAP based on Mother's representation that he was M.C.L.'s biological father, but that he was later informed that he was not the father of the child. He asserted in his petition that Mother would not consent to a voluntary paternity test. Lewis also claimed that Mother had committed fraud upon him. The State was not served with a copy of the petition or notified of any hearing on the petition. Despite the lack of notice to the State, on June 1, 2005, the Juvenile Court ordered the paternity test requested by Lewis. The results of the test showed that Lewis was not the biological father of M.C.L.

On June 15, 2005, the Juvenile Court held a hearing in the matter, Judge William S. Rhea presiding. The record does not contain a transcript of the hearing. On July 13, 2005, an order was entered, acknowledging that the results of the paternity test excluded Lewis as M.C.L.'s biological father. On that basis, the trial court ended Lewis's obligation to pay any future child support and

---

[1]By operation of law, Mother and M.C.L. assigned their child support rights to the State of Tennessee in exchange for public assistance, pursuant to the federal Title IV-D program. *See Baker v. State ex rel. Baker*, No. 01A01-9509-CV-00428, 1997 WL 749452, at \*3 (Tenn. Ct. App. Dec. 5, 1997). Therefore, the State of Tennessee is the real party in interest in this case.

absolved Lewis from being "responsible for any arrearages or retroactive child support that was set by an earlier order of this Court." The State did not receive a copy of the Juvenile Court's order.

On August 10, 2005, Lewis filed a "Petition for Damages and Costs" in the Juvenile Court against Mother, alleging that her fraud in falsely telling him that he was the only man who could have fathered M.C.L. caused him emotional distress and "financial costs including but not limited to payment of child support, payment of arreages [sic], attorney's fees, paternity test fees, and court costs." Lewis sought reimbursement from Mother for all of the child support payments he had made, his payments toward the paternity tests, and his reasonable attorney's fees and costs. As with the earlier proceedings, the State was not served with a copy of Lewis's petition and was not given notice of the hearing on it.

On September 21, 2005, the Juvenile Court conducted a hearing on Lewis's petition for damages, Judge Rhea again presiding. The record does not include a transcript of the hearing. Thereafter, on October 21, 2005, an order was entered finding that Mother intentionally deceived Lewis by telling him that he was the only possible father of the child. Based on this finding and the results of the earlier paternity test, the Juvenile Court awarded Lewis a judgment against Mother in the amount of $9,381.61, representing child support and insurance erroneously paid, a tax refund, costs of paternity testing, and attorney's fees incurred as a result of her fraud. The Juvenile Court reiterated that Lewis's child support payments would cease, and that Lewis was not to be held responsible for any arrearage. The State was not served with a notice of this order.

Thereafter, the State filed a petition for contempt against Lewis in the Juvenile Court. The State's petition noted that Mother was receiving Title IV-D services, and that, consequently, the State was authorized to act on her behalf. The petition stated that Lewis was in arrears on his child support obligation and that he refused to pay.

Subsequently, the State apparently became aware of the Juvenile Court's disestablishment of Lewis's paternity and the orders flowing from that. As a result, on February 6, 2006, the State filed a motion in the Juvenile Court, asking the Court to set aside its June 1, July 13, and October 21, 2005 orders, ordering paternity tests, disestablishing Lewis's paternity, ending his child support obligation, absolving him of responsibility for past arrearages, and awarding him damages against Mother. The motion was based on the fact that the State was not served with copies of Lewis's petitions or given notice of the hearings on them. On February 21, 2006, the Juvenile Court entered an order setting aside those three orders.

On March 8, 2006, Lewis filed a motion to set aside the VAP based on Mother's fraud. He asked the Juvenile Court to disestablish his paternity, set aside the January 2004 order setting his child support obligation, hold Mother in contempt for committing fraud, and award him attorney's fees and costs. The State received proper notice of this motion.

On June 7, 2006, Juvenile Court Judge Rhea conducted a *de novo* hearing at which both Mother and Lewis testified. Lewis testified that Mother had told him that he was the only possible

father of M.C.L., and that he relied on her representations in signing the VAP. He claimed that he did not know that Mother was living with Yates at the time the child was conceived. In 2005, Lewis stated, a friend of Mother's called him and told him that he was not the father of M.C.L. After that, Lewis asked Mother to consent to paternity testing; she refused, asserting that the test was unnecessary because Lewis was the only possible father. After the results of the paternity test indicated that Lewis was not the biological father, Lewis said that Mother responded by saying, "I told you I was seeing someone else." Lewis testified that Mother would not tell him the name of M.C.L.'s biological father.

Mother also testified. She said that when she learned that she was pregnant, she told Yates that he was the father of the unborn child. Yates responded by telling her that he was unable to father children. Mother conceded that she suspected that Yates's assertion was untrue because he had several other children. Mother testified that Lewis assumed that he was the father of the child, and she did not tell him otherwise. She also claimed that, when M.C.L. was born, she thought Lewis was the child's father. Mother said that she and Lewis did not discuss whether she was having sexual relations with anyone else at the time that the child was conceived. She maintained, however, that Lewis was aware that she was living with Yates, so he must have known that there was a possibility that Yates was M.C.L.'s father. She indicated that Lewis instigated his execution of the VAP; he called her to see whether she wanted the child to have his last name and drove her to the health department where they both signed the VAP. Mother said that, when they signed the VAP, she believed that Lewis was the father. Mother did not want to explore whether Yates was M.C.L.'s biological father, because she suspected that Yates was in a relationship with her sister and broaching the topic with him might cause family problems.

At the conclusion of the hearing, the Juvenile Court credited Lewis's testimony on all disputed points and concluded that Mother had committed an ongoing fraud against Lewis. On September 30, 2006, the Juvenile Court entered an order consistent with its oral findings.[2] It reinstated the October 21, 2005 order, in which the Juvenile Court (1) disestablished Lewis's paternity of the child; (2) ended all of Lewis's future child support obligations; (3) forgave all arrearages and/or retroactive child support due for M.C.L.; and (4) granted Lewis a judgment against Mother in the amount of $9,381.61. The order of the Juvenile Court was made final on February 7, 2007. From this order, the State now appeals.

On appeal, the State does not challenge the Juvenile Court's finding that Mother committed fraud, nor does it challenge the Juvenile Court's decision to set aside the VAP or end Lewis's future child support obligation. The State argues, however, that the Juvenile Court erred in forgiving the child support arrearage accrued before Lewis's petition to set aside the VAP; it contends that the order was an impermissible retroactive modification of a valid child support order. In addition, the State asserts that the Juvenile Court was without subject matter jurisdiction to grant Lewis a judgment against Mother for child support that he had paid and other expenses that he incurred in this matter.

---

[2]For reasons that are not apparent in the record, this order was signed by Judge J. Mike Whitaker.

Both issues raised by the State on appeal are questions of law, which we review *de novo*, with no presumption of correctness in the Juvenile Court's decision. *Alexander v. Alexander*, 34 S.W.3d 456, 459 (Tenn. Ct. App. 2000); Tenn. R. App. P. 13(d).

We first address the State's argument that the Juvenile Court erred in forgiving the child support arrearages. The State argues that the Juvenile Court's forgiveness of Lewis's child support arrearage was contrary to the plain language of Tennessee Code Annotated § 36-5-101(f)(1), which prohibits retroactive modification of a child support order. In response, Lewis contends that the Juvenile Court did not retroactively modify the operative child support order; rather, it set aside the order pursuant to Rule 60.02 of the Tennessee Rules of Civil Procedure. Lewis contends that Rule 60.02 permits a Juvenile Court to set aside a judgment based on fraud and other factors. Setting aside the order, Lewis maintains, does not constitute an impermissible retroactive modification of the order.

The operative child support order is the agreed order entered by the Juvenile Court on January 16, 2004. This order set Lewis's monthly child support payments at $317 and established an arrearage of $13,314. Tennessee Code Annotated § 36-5-101(f)(1) provides:

> Any order for child support shall be a judgment entitled to be enforced as any other judgment of a court of this state and shall be entitled to full faith and credit in this state and in any other state. ***Such judgment shall not be subject to modification as to any time period or any amounts due prior to the date that an action for modification is filed and notice of the action has been mailed to the last known address of the opposing parties.*** If the full amount of child support is not paid by the date upon which the ordered support is due, the unpaid amount is in arrears and shall become a judgment for the unpaid amounts and shall accrue interest from the date of the arrearage at the rate of twelve percent (12%) per annum. . . .

T.C.A.§ 36-5-101(f)(1) (2005) (emphasis added).

Prior to the 1987 amendment of Section 36-5-101, retroactive modification of a child support order was permitted where it was necessary "to meet the ends of justice." *Rutledge v. Barrett*, 802 S.w.2d 604, 606 (Tenn. 1991). As amended, however, the statute makes no provision for such a modification. The Tennessee Supreme Court has held, applying the plain language of this statute, that a valid child support order is not subject to retroactive modification. "[P]rospective modifications can be made, but only after notice" has been provided. *Id.* Therefore, the court has no authority to forgive an accrued child support arrearage, but may only modify a child support obligation back to "the date that an action for modification is filed and notice of the action has been mailed to the last known address of the opposing parties." T.C.A. § 36-5-101(f)(1); *see Alexander*, 34 S.W.3d at 460.

Moreover, again relying on the plain language of the statute, the Tennessee Supreme Court held that a child support order is not subject to challenge based on equitable defenses such as fraud,

-5-

because to do so would "defeat the very purpose of the amendment." *Rutledge*, 802 S.W.2d at 607. Lewis contends that the trial court did not "retroactively modify" the child support order; rather, it merely "set it aside" under Rule 60.02. This argument, however, is based more on semantics than substance; the effect of the Juvenile Court's action in this case is to absolve Lewis of responsibility for the arrearage, contrary to the explicit language of the statute. Indeed, applying *Rutledge*, this Court has held that a child support obligor who is later determined not to be the biological father of a child whom he has been ordered to support may not obtain retroactive relief of the valid child support order by having the order set aside under the provisions of Rule 60.02. *See In re T.S.R.*, No. W2003-01321-COA-R3-JV, 2004 WL 1361359, at *3 (Tenn. Ct. App. June 17, 2004); *State ex rel. Phillips v. Phillips*, No. E2001-02081-COA-R3-CV, 2002 WL 31662544, *2-*3 (Tenn. Ct. App. Nov. 26, 2002). As the *Rutledge* Court recognized, the effect of the statute may "seem harsh," but its purpose is to ensure that children receive adequate support. *Rutledge*, 802 S.W.2d at 607. Consequently, we must hold that the Juvenile Court in the instant case lacked the authority to forgive Lewis's child support arrearage that accrued prior to the date on which he filed a motion for relief from the support order and gave notice of the motion to the State, the real party in interest.

The State also argues that, for two reasons, the Juvenile Court lacked subject matter jurisdiction to grant Lewis a judgment against Mother for damages incurred in connection with this matter. First, the State claims that, because Mother was a recipient of Title IV-D benefits and had assigned all her rights to child support to the State, the State was the real party in interest and the action was in effect brought against the State. Because the State has sovereign immunity from such actions, the Juvenile Court lacked subject matter jurisdiction to adjudicate the claim. Second, the State argues that the Juvenile Court is a court of limited jurisdiction, and its jurisdiction does not include the authority to order one party to reimburse another for child support paid and other expenses incurred in a child support enforcement action. In support, the State cites *White v. State ex rel. Armstrong*, No. M1999-00713-COA-R3-CV, 2001 WL 134601, at *2 (Tenn. Ct. App. Feb. 16, 2001).

In response, Lewis argues that sovereign immunity is not implicated because Lewis's claim for damages is against Mother, not the State of Tennessee. Furthermore, he argues, the Juvenile Court had subject matter jurisdiction based on its broad statutory authority to establish a child's paternity and issue orders setting, modifying, and terminating support. Lewis also cites *White v. Armstrong* in support of his position. He contends that implicit in the grant of authority to the Juvenile Court is the power to order reimbursement, repayment, or disgorgement of child support funds that were obtained by fraud. Therefore, Lewis maintains, the Juvenile Court had the subject matter jurisdiction to make the award of damages against Mother.

We consider first the Juvenile Court's jurisdiction to order one party to reimburse another for child support and other such expenses wrongfully paid. "The concept of subject matter jurisdiction implicates a court's authority to hear and decide a particular type of case." *Id.* at *2. Subject matter jurisdiction is derived from either the Constitution or from legislation; unless the court has been granted jurisdiction directly or by necessary implication to consider the cause of

-6-

action and grant the relief sought, the court is without authority to act. *Id.* An order issued by a court without subject matter jurisdiction is neither valid nor enforceable. *Id.*

The juvenile courts did not exist at common law and are not included in our State's Constitution. They are entirely creatures of statute. *See* T.C.A. § 37-1-101, *et seq.* (2005). The juvenile court's jurisdiction, then, is defined by the statutes granting them power to act. *White*, 2001 WL 134601, at *2. "We must take care not to extend the subject matter jurisdiction of the juvenile courts beyond the jurisdiction conferred on them by the General Assembly." *Id.*

The subject matter jurisdiction of the juvenile courts to order reimbursement of child support paid pursuant to a valid order of child support was addressed directly by this Court in *White v. State ex rel. Armstrong*, cited by both parties. In *White*, a putative father had signed a VAP, believing the child at issue to be his. It later turned out that he was not the child's biological father. He was relieved of his future child support obligation by the juvenile court. Thereafter, he filed a "motion for judgment of overpaid child support" against the State and the mother of the child, seeking reimbursement for the child support he had paid on behalf of the child. The juvenile court denied the putative father's motion based on lack of jurisdiction. The appellate court affirmed, based in part on "the inherent limitations on the jurisdiction of juvenile courts. . . ." *White*, 2001 WL 134601, at *2. After reviewing the statutes regarding the authority of the juvenile courts, the *White* court stated:

> While the juvenile courts have broad statutory authority to establish a child's paternity and to issue orders setting, modifying or even terminating child support, we find no statute giving the juvenile courts authority, expressly or by implication, to order the State to reimburse a person who has voluntarily paid child support based on the mistaken belief that he was the child's biological father. In the absence of statutory authority, the juvenile courts do not have subject matter jurisdiction over requests of this sort.

*Id.* Thus, finding no statute granting the juvenile court the authority to order the State to reimburse child support that has been paid, the *White* court concluded that the juvenile court did not have subject matter jurisdiction to do so.

In the instant case, Lewis filed a "Petition for Damages and Costs" against Mother. This differed slightly from the "motion for judgment of overpaid child support" filed by the putative father in *White* in two respects. First, Lewis did not name the State as a defendant, as did the father in *White*. Second, in addition to reimbursement for the child support payments made, Lewis sought all damages caused as a result of Mother's fraud. Citing no authority, Lewis simply makes the conclusory assertion that the Juvenile Court's authority to order such relief is "implicit." He cites no statutory basis for this argument, and we have found none. As did the Court in *White*, we must

conclude that the Juvenile Court did not have subject matter jurisdiction over Lewis's "Petition for Damages and Costs" against Mother.[3]  This holding pretermits the issue of sovereign immunity.

The decision of the Juvenile Court is reversed.  Costs on appeal are taxed to Respondent/Appellee Sam Lewis, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE

---

[3]We express no opinion about any cause of action that Lewis may assert in another forum against Mother or the biological father of M.C.L.